*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0237p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

        No. 08-1540

LEONARDO HERRERA-ZUNIGA,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00283-001—Robert Holmes Bell, District Judge.

Argued: April 23, 2009

Decided and Filed: July 8, 2009

Before: COLE and CLAY, Circuit Judges; CLELAND, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Richard D. Stroba, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Jennifer L. McManus, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Richard D. Stroba, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. Donald Daniels, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. After Defendant, Leonardo Herrera-Zuniga ("Herrera-Zuniga"), pleaded guilty to illegally reentering the country after previously being

_____

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

removed subsequent to a felony conviction, in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(1), the district court sentenced him to 48 months imprisonment, a term significantly above the 24-to-30-months sentencing range recommended under the Sentencing Guidelines. Because Herrera-Zuniga was on supervised release from a prior felony conviction at the time of his arrest, the court also imposed a 12-month sentence for the supervised release violation, ordering the sentences to run concurrently. On appeal, Herrera-Zuniga challenges the procedural and substantive reasonableness of his 48-month sentence. For the reasons set forth below, we hereby **AFFIRM** the sentence imposed by the district court.

## I.

On September 2, 2007, authorities stopped Herrera-Zuniga's vehicle because of "headlight and license plates violations." After Herrera-Zuniga failed field sobriety tests, officers placed him under arrest and transported him to the Oceana County Jail in Hart, Michigan. The Oceana County Sheriff's Department then contacted Immigration and Customs Enforcement ("ICE") and determined that Herrera-Zuniga was illegally present in the United States.

According to the presentence investigation report ("PSIR"), Herrera-Zuniga's 2007 arrest was but the latest incident in a series of encounters with authorities over the last ten years involving nearly identical conduct. In 1998, Herrera-Zuniga was arrested for being a minor in possession of alcohol and was subsequently granted a voluntary return to Mexico. In 2000, Herrera-Zuniga was arrested and convicted for operating a vehicle while under the influence of alcohol and was subsequently deported to Mexico. And in 2006, Herrera-Zuniga once again was arrested and convicted for illegally reentering the United States and again was deported to Mexico.

In addition to these three incidents, each of which resulted in Herrera-Zuniga being removed from the United States, the PSIR also identifies a number of other alcohol-related arrests and convictions that apparently did not result in Herrera-Zuniga's deportation. In 2002, Herrera-Zuniga was arrested and charged under the name of Jose

Jesus River-Lucio for operating a vehicle while intoxicated. A bench warrant was issued in that case after he failed to appear on the charge, but the case was dismissed *nolle prosequi* after a subsequent arrest and conviction. In 2003, Herrera-Zuniga again was arrested and pleaded guilty to operating a vehicle while intoxicated. After he failed to complete an alcohol treatment program while in prison, Herrera-Zuniga was ordered to appear for an assessment for an outpatient treatment program. When he failed to appear for the scheduled assessment, another bench warrant was issued for his arrest.

Each of these incidents involved conduct strikingly similar to Herrera-Zuniga's most recent arrest. In each case, Herrera-Zuniga was present in the United States illegally, and, in most cases, he was arrested for driving a vehicle while under the influence of alcohol. All told, the PSIR reports that, prior to his 2007 arrest, Herrera-Zuniga had been sentenced to terms of 30 days, one year (with six months suspended), 90 days, 30 days, nine months, 11 months, and one year. He also has been removed from the country on three separate occasions.

On January 9, 2008, pursuant to a written plea agreement, Herrera-Zuniga entered a plea of guilty. Based on his prior offenses, the PSIR calculated Herrera-Zuniga's criminal history score to be 15,[1] placing him in category VI, the highest criminal history category available under the Guidelines. Taken together with a total offense level of 10,[2] the PSIR calculated the recommended sentencing range to be 24 to 30 months. Herrera-Zuniga did not object to these calculations.

---

[1] Although properly calculating Herrera-Zuniga's criminal history score to be 15, the probation officer mistakenly stated in one section that Herrera-Zuniga "has amassed 16 criminal history points." PSIR ¶ 54. This error, however, was corrected at Herrera-Zuniga's sentencing hearing after defense counsel brought the inconsistency to the attention of the sentencing judge who expressly acknowledged the error and concurred that Herrera-Zuniga's proper criminal history score was 15. Record on Appeal ("ROA") vol. 2 at 8-9.

[2] The base offense level for a violation of 8 U.S.C. § 1326(a) is 8. U.S.S.G. § 2L1.2(a). The base offense level was increased by four levels pursuant to U.S.S.G. § 2L1.2(b)(1)(D) because Herrera-Zuniga previously was deported subsequent to a felony conviction. *See* PSIR ¶ 15. Herrera-Zuniga then received a 2-level reduction pursuant to U.S.S.G. § 3E1.1(a) for accepting responsibility and expressing remorse for his conduct. *See* PSIR ¶ 20.

The PSIR also noted several factors that potentially warranted an upward departure under U.S.S.G. § 4A1.3(a),[3] including that Herrera-Zuniga's criminal history score "appears to substantially under-represent the seriousness of Mr. Herrera-Zuniga's criminal history or the likelihood that he will commit future crimes." PSIR ¶ 54. After receiving the PSIR, the court issued a "Notice of Intent to Upward Depart Under the Guidelines." In that Notice, the court agreed that the "calculation of guideline sentencing does not adequately reflect the Defendant's Criminal History Level," and thus advised the parties that it was "considering . . . an upward departure from the guidelines to more accurately reflect the Criminal History Level of the Defendant." ROA vol. 1 at 15.

Two days later, counsel for Herrera-Zuniga, Assistant Federal Public Defender Richard D. Stroba ("Stroba"), submitted a sentencing memorandum on Herrera-Zuniga's behalf. ROA vol. 1 at 16-21. That memorandum briefly noted Herrera-Zuniga's acceptance of responsibility but offered no further argument under any of the relevant 18 U.S.C. § 3553(a) factors. For instance, the memorandum did not attempt to explain that Herrera-Zuniga claimed to have returned to the United States to earn money to support his family back in Mexico, including his "sick" daughter, despite the fact that the PSIR noted this issue on multiple occasions. *See* PSIR ¶¶ 12, 45-46. Nor did the sentencing memorandum respond to the suggestion that Herrera-Zuniga's criminal history score under-represented the seriousness of his past criminal conduct. Instead, defense counsel asked only that the court "give due deference to the parsimony principle of the sentencing statute." ROA vol. 1 at 17.

More troubling than what the memorandum did not say, however, is what it did say:

> In lieu of further commentary or a likely useless review of the 18 U.S.C. § 3553(a) factors, counsel for the Defendant simply refers the Court to

---

[3] Sentencing Guideline § 4A1.3(a)(4)(B) provides that, where "the court determines that the extent and nature of the defendant's criminal history, taken together, are sufficient to warrant an upward departure," the court "should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case."

the attached letter sent to Mr. Herrera-Zuniga this past week.  For better or worse, it sets forth the position the Defendant has placed himself in before this Court and society.

ROA vol. 1 at 16-17.  The letter to which the sentencing memorandum refers was sent on April 2, 2008 by Stroba to Herrera-Zuniga.  *Id.* at 19-21.  Although the letter expressly states that it may contain "Attorney/Client Privileged Information," *id.* at 19, Stroba nevertheless attached the letter to the sentencing memorandum and submitted it to the court.  Given the tenor and substance of the letter, we do not understand how Stroba could have felt that it was in his client's interests to submit it to the court.  In fact, the letter reads more like an argument by the prosecutor in favor of a harsher sentence than it does an argument by the defense:

> My duty now is to try to write a sentencing memorandum on your behalf.  I knew this day was coming and I knew it would be a difficult task, but for the first time in my two and a half years of service to the Defenders Office, I must admit that I am completely stymied (i.e., without a place to go).  *There is not one thing about your situation that lends itself to a positive thought*, save that you have a good work history.
> You are clearly an alcoholic with either no ability or desire to quit drinking, for, surely if you wanted to or could, you would at least do so as a means of staying in this country. . . .  At some point either you will stop consuming alcohol on your own, or you will develop cirrhosis of the liver and *you will die a slow, painful, horrible death*.  And then you will be done drinking for sure.
> The problem is that for the rest of society, in the meantime, before you stop drinking, one way or another, you will continue to drink alcohol to excess and then drive motor vehicles.  You have five convictions for drunk driving.  By the grace of God, you have not been involved in a serious accident.  Unfortunately, it is only by that divine intervention that that is the case.  And every time you take the wheel either impaired or completely inebriated, you defy the odds.  *It is only a matter of time before you kill or seriously injure yourself (perhaps that is your goal).  The concern for the court, I, and the rest of society is that you are more likely to kill, maim, or injure some innocent driver or passenger in another vehicle or a bystander*.  There would be no recovery for that victim or family.  *There would be no mercy for you*.
> And then there is the overriding problem to all of this.  You are not supposed to be in this country in any event.  I am not talking about just coming here without documentation to earn a living that you could not earn in Mexico. I am talking about the ordered deportation of you on at least two occasions.

*Id.* at 19-20 (emphasis added).  If this gratuitous admonishment of his client were not enough, Stroba then continues:

> *I am truly at a loss to figure out how to explain to Chief Judge Bell that somehow or in some manner, he should not treat you most severely.*  Perhaps before the 11th of April you will have formulated some statement or some explanation (that has completely escaped me) in the face of these facts.  *Your action returning to the U.S. in 2007 was wrong.  Your drinking and driving upon that return (and to return to this district as well) is just plain stupid.*
> I am sorry to be so blunt, but I have to honest with you, your case has left me without an expressible empathy.  For this I am sorry because *it leaves me almost unable to advocate on your behalf.*  (I say "almost" because as you are one of God's creatures, any person can advocate for mercy or lenience premised upon your basic humanity.  But that job is a tough one, made ever more so by your conduct.)

*Id.* at 20 (emphasis added).  Stroba then returns to chastising Herrera-Zuniga, stating "you are certainly at the bottom of society's hierarchy, [and] you have done very little on your own behalf to be anywhere but there."  *Id.*  Near the end of the letter, Stroba pointedly states:  "There simply is not a great deal of hope and optimism to be found here.  My verbal statement to the Court will be equally limited."  *Id.* at 21.

At the sentencing hearing, the court disposed of the supervised release violation related to Herrera-Zuniga's 2006 conviction by revoking his supervised release and sentencing him to 12 months imprisonment.  The court then turned its attention to the illegal reentry charge.  After conducting the requisite colloquy to ensure that Herrera-Zuniga understood his rights and that he had reviewed and understood the PSIR, the court accepted Herrera-Zuniga's guilty plea.  The court then asked defense counsel whether he had anything to add to the sentencing memorandum.  Stroba acknowledged that his sentencing memorandum "was a little different,"[4] but explained that he "wanted

---

[4]Demonstrating just how unorthodox Stroba's sentencing memorandum was, the prosecution, when asked by the court whether it had anything to add regarding sentencing, stated:

> Your honor, we did not submit a sentencing memorandum because I feel that the presentence report *and the defendant's sentencing memorandum* correctly identified the defendant's principal issue, that being alcoholism, and a failure to comply with the laws of the United States with respect to being present here and staying off the highways

to provide Mr. Herrera-Zuniga with some things to think about before coming to sentencing today and [advise him of] what this Court faces in terms of sentencing him based upon his conduct." ROA vol. 3 at 10. Beyond that, Stroba stated only:

> We would ask the Court or comment that within the parameters of the recommended sentence and the advisory guidelines here, even the high end, [and] considering that [Herrera-Zuniga is] going to serve 12 months on the supervised release violation as well, that there's a pretty significant amount of time this Court has within those parameters to sentence him.

*Id.* Finally, Stroba asked the Court to request that the Bureau of Prisons provide Herrrera-Zuniga substance abuse treatment. *Id.*

During the sentencing hearing, Stroba did not point to any § 3553(a) factors that may have warranted a more lenient sentence. Stroba also did not argue that the PSIR's calculation of Herrrera-Zuniga's criminal history score adequately represented the seriousness of Herrrera-Zuniga's past criminal conduct.

In pronouncing sentence, the district court noted that Herrera-Zuniga was "appropriately" placed in criminal history category VI, but expressed "astonish[ment]" that the base offense level prescribed under Sentencing Guideline § 2L1.2(a) for a violation of 8 U.S.C. § 1326(a) "is so low." ROA vol. 3 at 12. Observing that the statute "carries a maximum [sentence] of 120 months,"[5] the court characterized the sentencing range recommended under the Guidelines as "arbitrar[y]" and "considerably out of balance" with Congress' intent. *Id.* at 12. According to the court, the "great variance" between the statutory maximum penalty and the "astonishingly" low offense level set forth in § 2L1.2(a) demonstrates that the Sentencing Commission had failed to fulfill its traditional "sentencing function," and had instead "arbitrarily pick[ed] a number and

---

when he's been drinking. So I really have little to add to that.

ROA vol. 3 at 11 (emphasis added). The government's brief to this Court also quotes from Stroba's letter at length as support for the district court's decision to upward depart.

[5] The statute provides a maximum sentence of "not more than 10 years." 8 U.S.C. § 1326(b)(1).

assign[ed] that number to [this] criminal statute." *Id.* The court concluded that "there's not a whole lot of persuasiveness in that." *Id.*

Rejecting the arbitrary "picking and choosing that the Commission has done" in determining the base offense level for this offense, the court instead chose to exercise its "authority to step away from that and look at the reality of the situation that Mr. Herrera-Zuniga finds himself in in this matter." *Id.* at 13. Observing that the sentencing range recommended under the Guidelines was advisory only, the court explained that its duty was "to impose a sentence sufficient to comply with the federal sentencing statute, not the guidelines . . . ." *Id.* The district court's rationale for rejecting the sentencing range recommended under the Guidelines thus plainly included a categorical, policy-based disagreement with the base offense level prescribed under U.S.S.G. § 2L1.2(a).

In addition, the court also found that a harsher sentence was warranted in light of the "unique circumstances of this case," including Herrera-Zuniga's "egregious" criminal history and his high likelihood of recidivism. ROA vol. 3 at 13-14 (expressing concern that "this offense is a repeat performance of earlier criminal behavior"). The court also found that Herrera-Zuniga's criminal history score under-represented the seriousness of his prior criminal conduct because the PSIR described numerous alcohol-related incidents "that did not result in convictions." *Id.* at 14 (pointing to PSIR ¶¶ 26-34, 39-40). In light of his extensive criminal history, the court concluded that Herrera-Zuniga "has absolutely no respect for the laws of the United States, none whatever [*sic*]." *Id.* The court also took into account "the public's need for protection[,] not only from [Herrera-Zuniga's] unlawfulness in coming into this country without permission, but [also from] his violating the laws of this country while he is here . . . ." *Id.* at 13. Considering Herrera-Zuniga's repeated illegal return to the United States and his repeated arrests on alcohol-related charges, the court concluded that "there is every reason to believe [that the chosen] sentence should be punitive and should in fact be a deterrent." *Id.* at 14.

Considering all of these various factors, the court sentenced Herrera-Zuniga to 48 months imprisonment on the illegal reentry charge, and ordered that this sentence was to run concurrently with the 12-month sentence imposed for the supervised release violation.

After pronouncing sentence, the sentencing judge, as required by *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), asked the parties whether they had "[a]ny legal objection to the sentence being imposed." ROA vol. 3 at 15. In response, defense counsel stated: "Your honor, I hesitate, but I suppose the Court having given notice of an intent to upward depart, it did not give us a final guideline range. I don't know if the Court cares to, but I assume that under *Kimbrough* or *Gall* that may be a necessary consideration." *Id.* The court responded by stating: "You have a right to appeal this sentence, Mr. Herrera." *Id.*

## II.

On appeal, Herrera-Zuniga challenges his sentence on both procedural and substantive grounds. As to the procedural aspects of his sentence, Herrera-Zuniga claims that the district court erred by failing to specify whether its decision to impose a sentence above the advisory Guidelines range was based on a "variance" under 18 U.S.C. § 3553(a) or a "departure" under U.S.S.G. § 4A1.3. Herrera-Zuniga also claims that, to the extent that his sentence is based on a departure under § 4A1.3, the court improperly concluded that his criminal history score under-represented the seriousness of his prior criminal conduct, and that the court improperly failed to specify a final, adjusted sentencing range. In challenging the substantive reasonableness of his sentence, Herrera-Zuniga claims that the district court lacked the authority to reject on policy grounds the base offense level prescribed under § 2L1.2(a), and that, as a result of this error, the district court imposed a sentence that is "greater than necessary" to achieve the sentencing goals identified by Congress in § 3553(a).

To determine what standard of review applies to each of these claims, we first must determine whether Herrera-Zuniga preserved these claims for appeal. Under the rule we adopted in *Bostic*, district courts are required, after announcing sentence, to "ask

the parties whether they have any objections to the sentence . . . that have not previously been raised." 371 F.3d at 872. Where the sentencing judge complies with this procedure, the defendant generally forfeits the right to challenge on appeal any procedural errors to which he did not object at the time of sentencing. *See United States v. Vonner*, 516 F.3d 382, 385-86, 390-91 (6th Cir 2008) (en banc). A defendant, however, is not required to object to the substantive reasonableness of his sentence to preserve that issue for appeal. *See United States v. Penson*, 526 F.3d 331, 337 (6th Cir. 2008) ("[D]efendants do not need to raise the claim of substantive unreasonableness before the district court to preserve the claim for appeal . . . .").

After pronouncing Herrera-Zuniga's sentence, the sentencing judge complied with the *Bostic* rule and provided the parties an adequate opportunity to raise "any legal objection" to the sentence just pronounced. Availing himself of that opportunity, defense counsel objected on the ground that the court had failed to provide "a final guideline range." By asserting that objection, defense counsel preserved Herrera-Zuniga's right to challenge on appeal that particular alleged error. However, defense counsel's objection did not encompass the full range of procedural errors that Herrera-Zuniga raises on appeal. Consequently, there is a question as to what standard of review applies to those other claims.

Strictly construed, the forfeiture rule approved in *Vonner* could be read to imply that Herrera-Zuniga has forfeited any procedural claims that he failed to specifically identify in response to the *Bostic* question. However, we do not read the rule adopted in *Vonner* so strictly. Under the circumstances, we find that *Vonner*'s forfeiture rule applies only to certain claims that defense counsel failed to assert below.

At no point during the sentencing hearing or in his sentencing memorandum did defense counsel ever argue that the PSIR's calculation of Herrera-Zuniga's criminal history score adequately represented the seriousness of Herrera-Zuniga's prior criminal conduct. The record indicates that the PSIR noted this issue as a possible basis for an upward departure, and the court's Notice of Intent to Depart also advised the parties that it would be considering this issue at sentencing. Nevertheless, Herrrera-Zuniga failed

to challenge that issue.  Nor did defense counsel raise this issue in response to the *Bostic* question.  Because defense counsel never made any argument regarding the adequacy of the PSIR's calculation of his client's criminal history, despite being given an adequate opportunity to do so, Herrera-Zuniga has forfeited his right to raise that claim on appeal. Consequently, we must review that issue for plain error only.

Although Herrrera-Zuniga has forfeited his right to challenge the court's determination of the inadequacy of his criminal history score on appeal, it would be inappropriate to apply *Vonner*'s forfeiture rule to Herrera-Zuniga's other claims—specifically, Herrera-Zuniga's claim that the district court lacked the authority to categorically reject the base offense level prescribed under § 2L1.2(a)—given the lingering confusion in this circuit as to whether such claims are "procedural" or "substantive" challenges.  In *United States v. Webb*, 403 F.3d 373 (6th Cir. 2005), this Court's first post-*Booker* attempt to clarify the scope of the reasonableness inquiry, we concluded that "[a] district judge act[s] unreasonably by, for example, selecting the sentence arbitrarily, basing the sentence on impermissible factors, failing to consider pertinent § 3553(a) factors, or giving an unreasonable amount of weight to any pertinent factor."  *Id.* at 385 (footnotes omitted).  Our decision in *Webb*, however, did not distinguish between the "procedural" and "substantive" components of our reasonableness inquiry.  *See Vonner*, 516 F.3d at 397 (Clay, J., dissenting) (explaining that the procedural and substantive inquiries initially were interrelated aspects of a unified reasonableness review).  Although subsequent decisions have imposed that distinction, those decisions have not drawn that line consistently.  In fact, a review of our subsequent sentencing decisions demonstrates that we confusingly have identified the exact same factors as exclusively part of both the procedural and substantive inquiries. *See, e.g.*, *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (identifying "failing to consider the § 3553(a) factors" as a basis for finding a sentence  "procedurally unreasonable" and "fail[ing] to consider pertinent § 3553(a) factors" as a basis for finding a sentence "substantively unreasonable").  As a result, the procedural and substantive components of our reasonableness inquiry "appear to overlap."  *United States v. Jones*, 489 F.3d 243, 252 n.3 (6th Cir. 2007); *United States v. Liou*, 491 F.3d

334, 337 (6th Cir. 2007) (recognizing that "the border between factors properly considered 'substantive' and those properly considered 'procedural' is blurry if not porous"); *see also United States v. Berry*, 565 F.3d 332, 342 (6th Cir. 2009) ("A challenge to a court's decision to impose a consecutive or a concurrent sentence is not easily classified as 'substantive' or 'procedural.' This is so because an evaluation of the substantive reasonableness of a decision to impose a consecutive sentence depends heavily upon an evaluation of the procedural reasonableness."). The confusion that this creates for defendants demands that we not apply *Vonner*'s forfeiture rule in this circumstance.

The circumstances of this case typify the confusion caused by this "overlap." Herrera-Zuniga characterizes his claim that the district court lacks the authority to categorically reject the base offense level prescribed under the Guidelines as bearing on the substantive reasonableness of his sentence. Although a number of our previous decisions support that characterization,[6] the Supreme Court's recent sentencing decisions strongly suggest that such claims are more properly construed as procedural challenges because they relate to the sentencing court's understanding and explanation of its authority to deviate from the Guidelines. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 597 (2007) (noting that the district court's "explanation for any deviation from the Guidelines range" is an aspect of the "procedural error" inquiry); *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 575-76 (2007) (considering a similar argument in the context of the crack cocaine guideline and holding that the district court "rested its sentence on the appropriate considerations and 'committed no procedural error'" (quoting *Gall*, 128 S. Ct. at 600)). In light of this lingering confusion, it would be inappropriate and patently unfair to apply *Vonner* in this context.

---

[6]*See, e.g.*, *United States v. Funk*, 534 F.3d 522, 530 (6th Cir. 2008) (characterizing claim challenging the district court's categorical rejection of the career offender guidelines as relating to the substantive reasonableness of the defendant's sentence), *vacated on grant of reh'g en banc*, No. 05-3708 (Dec. 18, 2008), *appeal dismissed*, 560 F.3d 619 (6th Cir. 2009) ("The opinion of the panel, which was vacated pursuant to the court's order of December 18, 2008 granting en banc review, 6 Cir. R. 35(a), remains vacated.").

Our decisions in *Bostic* and *Vonner* support this pragmatic application of *Vonner*'s forfeiture rule. As a general proposition, the Federal Rules of Criminal Procedure require that a defendant object to rulings by the sentencing judge in order to preserve them for appeal. Fed. R. Crim. P. 51(b). Where a defendant fails to properly preserve an issue for appeal, that claim is subject to review for plain error only. Fed. R. Crim. P. 52(b). Nothing in the Federal Rules, however, expressly requires that the defendant, once his sentence is imposed, specifically identify each of the distinct procedural errors that the court might have committed in pronouncing sentence. Rather, that is a rule developed by this Court under "our supervisory powers over the district courts." *Bostic*, 371 F.3d at 872.

As we explained in *Bostic*, however, this rule was adopted entirely for practical reasons. Specifically, we thought that the *Bostic* procedure would help bring potential errors made during sentencing to the attention of the district court, and thus would "permit[] the district court to correct on the spot any error it may have made" in pronouncing sentence. *Id.* at 873 (citation omitted). We also adopted the rule to help create a more reliable record for appeals, which we believed would help "guid[e] appellate review." *Id.* In putting teeth to this rule in *Vonner*, we again emphasized the "sensible and useful feature[s]" of the *Bostic* process, explaining that requiring defendants to raise certain types of objections below has "the salutary effect of encouraging the resolution of those issues at the sentencing hearing—when they matter most and when they can be most readily resolved." 516 F.3d at 391. In fact, in attempting to define the contours of this requirement, our decision in *Vonner* expressly encouraged "a common-sense application of the plain-error doctrine," and instructed future courts to apply the rule "with an eye to the realities of the facts and circumstances of each sentencing proceeding." *Id.*

Because the *Bostic* procedure and the *Vonner* forfeiture rule were adopted to serve practical ends, it would be inappropriate to construe those requirements as formal and inflexible procedural protocols. To construe those requirements more strictly would ignore *Vonner*'s "common-sense" approach, and would turn a rule that undoubtedly was

adopted for practical reasons into a meaningless formality, something we are loathe to do.

Respecting *Vonner*'s command that we make a "common-sense application of the plain-error doctrine," we simply cannot find that Herrera-Zuniga has forfeited his claim regarding the court's lack of authority to reject the advisory Guidelines range on policy grounds. Given the nature of this claim, none of the practical ends identified in *Bostic* and *Vonner* would have been furthered even if defense counsel had raised this issue below.[7] Although defense counsel did not raise this particular claim of procedural error below, it is not subject to plain-error review.

### III.

Those claims not forfeited under *Vonner* are subject to the traditional standard of review that governs sentencing challenges. After *United States v. Booker*, 543 U.S. 220 (2005), the sentencing Guidelines are "advisory" only, and thus a district court is no longer bound by the sentencing range prescribed thereunder. *Id.* at 245. Although recognizing that the federal sentencing statute still "requires a sentencing court to consider Guidelines ranges," *Booker* determined that sentencing judges are permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* at 245 (citing 18 U.S.C. § 3553(a)). In light of this authority, we "review a district court's sentencing determination, 'under a deferential abuse-of-discretion standard,' for reasonableness[.]" *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (quoting *Gall*, 128 S. Ct. at 591); *see also Rita v. United States*, 551 U.S. 338, 347-51 (2007). This standard applies "'[r]egardless of whether the sentence imposed is inside or outside the Guidelines range . . . .'" *United States v. Higgins*, 557 F.3d 381, 397 (6th Cir. 2009) (quoting *Gall*,

---

[7]We fail to see how requiring defense counsel to object after sentencing that the district court lacks the authority to deviate from the Guidelines based on a categorical, policy-based disagreement with the severity of the sentencing range would help clarify the record or encourage the resolution of the issue at the sentencing hearing. Regardless of whether defense counsel had asserted a more detailed objection at the time of sentencing, the sentencing transcript indicates that the district court was not going to correct this issue "on the spot," as the sentencing judge already had stated that he believed that he had the authority to reject the advisory sentencing range on this basis. In this circumstance, it is difficult to imagine any practical reason to require a defendant to raise an objection that is patently futile. *Vonner* does not require such formalism.

128 S. Ct. at 597).  Thus, a district court's decision to exercise its discretion to depart from the advisory Guidelines, either upward or downward, is reviewed for reasonableness.  *See United States v. Smith*, 474 F.3d 888, 894 (6th Cir. 2007) ("Therefore, it is here that we will incorporate our post-*Booker* jurisprudence to our review of upward departures under § 4A1.3.").

The reasonableness of a district court's sentence "has both substantive and procedural components." *Jones*, 489 F.3d at 250.  Consequently, our "reasonableness review requires [inquiry] into both 'the length of the sentence' and 'the factors evaluated and the procedures employed by the district court in reaching its sentencing determination.'" *Liou*, 491 F.3d at 338 (quoting *Webb*, 403 F.3d at 383).  In conducting this review, we must "'first ensure that the district court committed no significant procedural error' and 'then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" *United States v. Smith*, 516 F.3d 473, 476 (6th Cir. 2008) (quoting *Gall*, 128 S. Ct. at 597).

In order for a defendant's sentence to be procedurally reasonable, the district court cannot presume that the sentencing range recommended under the Guidelines is mandatory or even reasonable.  *See Gall*, 128 S. Ct. at 596-97 (sentencing judges "may not presume that the Guidelines range is reasonable"); *Bolds*, 511 F.3d at 578.  Instead, the sentencing court must "make an individualized assessment [of the appropriate sentence] based on the facts presented." *Gall*, 128 S. Ct. at 597.  In making that determination, the sentencing judge is obliged to consider the unique circumstances of the defendant's case in light of the factors set out by Congress in 18 U.S.C. § 3553(a). *See Bolds*, 511 F.3d at 578.

Although the Sentencing Guidelines are advisory, the Supreme Court nevertheless has instructed that the sentencing range recommended thereunder must be "the starting point and initial benchmark" of the district court's sentencing analysis. *Gall*, 128 S. Ct. at 596; *see also Bolds*, 511 F.3d at 579.  The Guidelines provide important guidance for district courts in making individualized sentencing determinations because, "in the ordinary case, the Commission's recommendation of a

sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 128 S. Ct. at 574 (quoting *Rita*, 551 U.S. at 350).

For that reason, sentences falling within the advisory Guidelines range may be considered presumptively reasonable. *Rita*, 551 U.S. at 347-51. Sentences that deviate from the Guidelines, however, are afforded no such presumption. Rather, in determining whether a given deviation is reasonable, we must take into account the degree of variance from the sentencing range recommended under the Guidelines. *See Gall*, 128 S. Ct. at 597 ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one."); *see also United States v. McMannus*, 436 F.3d 871, 874 (8th Cir. 2006) ("[T]he farther the district court varies from the presumptively reasonable guidelines range, the more compelling the justification based on the § 3553(a) factors must be."); *United States v. Hernandez-Villanueva*, 473 F.3d 118, 123 (4th Cir. 2007) ("When we review a sentence outside the advisory sentencing range – whether as a product of a departure or a variance – we consider whether the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range."). Accordingly, the amount of deference that is due in any particular case varies: in those cases that fall outside the Guidelines' "heartland," the district court's decision to deviate from the advisory range is entitled to the "greatest respect," whereas a sentence that departs from the advisory range in a "mine-run case" warrants "closer review." *Kimbrough*, 128 S. Ct. at 575 (quoting *Rita*, 551 U.S. at 351).

In determining the reasonableness of the district court's decision to deviate from the Guidelines, we must consider whether the sentence reflects the considerations set forth in § 3553(a). *Gall*, 128 S. Ct. at 596-97. We also must evaluate any departure from the advisory Guidelines range in light of the Sentencing Commission's determination that an upward departure might be warranted where "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). In fact, this Court has reasoned that

a departure is "expressly encouraged" under § 4A1.3 where the recommended sentencing range does not adequately account for the defendant's past criminal conduct. *See United States v. Barber*, 200 F.3d 908, 912 (6th Cir. 2000) ("a departure upon this basis is expressly encouraged by the Sentencing Guidelines") (citing *United States v. Pluta*, 144 F.3d 968, 977 (6th Cir. 1998)); *see also United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003).

In conducting this review, we must bear in mind that reasonableness "is a flexible standard which 'involves what is quintessentially a judgment call. . . . Appellate review must occur with full awareness of, and respect for, the trier's superior "feel" for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.'" *United States v. Thomas*, 24 F.3d 829, 833 (6th Cir. 1994) (quoting *United States v. Joan*, 883 F.2d 491, 494 (6th Cir. 1989)). In other words, we must accord "substantial deference" to the district court's decision to depart because "questions concerning sentencing departures necessarily address the district court's 'refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.'" *Pluta*, 144 F.3d at 977 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).

## IV.

Herrera-Zuniga asserts a number of claims alleging that the district court committed procedural error in deviating from the advisory Guidelines range. We review each in turn.

### Categorical, Policy-Based Disagreement with the Guidelines

First, Herrera-Zuniga claims that the district court erred in categorically rejecting the offense level prescribed under the Guidelines for illegal reentry offenses based on its policy-based disagreement with the severity of the sentencing range that the offense level yielded.[8]

The sentencing transcript leaves no doubt that the district court's policy-based disagreement with the severity of the recommended sentencing range was a major factor in its decision to impose a harsher sentence. In pronouncing sentence, the district court expressed "astonish[ment]" that the offense level prescribed under the Sentencing Guidelines "is so low." Noting the 10-year maximum penalty provided for under 8 U.S.C. § 1326(b)(1), and pointing to the more severe sentencing ranges prescribed under the Guidelines for other offenses that carry a similar statutory maximum penalty, the district court rejected the 24-to-30-month advisory range as "arbitrar[y]" and "considerably out of balance" with the statute.

In its recent decision in *Spears v. United States*, ___ U.S. ___ , 129 S. Ct. 840 (2009), the Supreme Court unequivocally recognized that district courts possess the "authority to vary from the crack cocaine Guidelines based on a *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Id.* at 843 (emphasis in original). The question we confront here is whether the authority recognized in *Spears* to reject on policy grounds an otherwise-applicable aspect of the Sentencing Guidelines is limited to the crack cocaine context.[9] We hold that it is not.

---

[8]As explained above, Herrera-Zuniga characterizes this claim as relating to the substantive reasonableness of his sentence. Under *Kimbrough* and *Gall*, however, it is apparent that this claim is more properly construed as a procedural challenge.

[9]This appears to be an issue of first impression in this Circuit. *See United States v. Vandewege*, 561 F.3d 608, 611 (6th Cir. 2009) (Gibbons, J., concurring) ("Applied to the present case, this debate over *Kimbrough* and *Spears*'s portent is purely academic."); *United States v. Johnson*, 553 F.3d 990, 996 (6th Cir. 2009) ("express[ing] no opinion on whether the principles articulated in *Spears* may apply outside of the crack-cocaine context to allow district courts to develop categorical alternatives to other sentencing

In *Spears*, the Supreme Court vacated an Eighth Circuit decision holding that the district court had no authority to substitute on policy grounds a different ratio for the then-applicable 100:1 crack-to-powder sentencing ratio. *Id.* at 842. In reaching that conclusion, the Court made clear that, at least "with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect." *Id.* at 843. Clarifying its holding in *Kimbrough*, the Court explained that sentencing judges possess the authority to "categorically" reject the sentencing range prescribed by the Guidelines, even in "a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range." *Id.* at 844 (quoting *Kimbrough*, 128 S. Ct. at 576).

Although *Kimbrough* and *Spears* both addressed this issue in the context of the crack-powder cocaine disparity, the Court's decisions in those cases suggest that this authority is not limited to that context. In *Kimbrough*, for instance, the Court expressly noted that, because the Guidelines are advisory only, "as a *general matter*, 'courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'" 128 S. Ct. at 570 (internal modifications and citation omitted) (emphasis added). *Kimbrough*'s recognition of the broad authority of sentencing judges reaffirmed the Court's holding in *Rita* that district courts could depart from the Guidelines whenever "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." 551 U.S. at 351. And in *Spears*, the Court justified its holding by explaining that, unless sentencing courts were given the authority to decline to follow the Guidelines on policy grounds, there were two possible outcomes: "Either district courts would treat the Guidelines' policy embodied in the crack-to-powder ratio as mandatory, believing that they are not entitled to vary based on 'categorical' policy disagreements with the Guidelines, or they would continue to vary, masking their

enhancements contained in the Guidelines"). Although we previously confronted this issue in *United States v. Funk*, *supra* (addressing the authority of the district courts to reject categorically the career offender enhancement set forth in U.S.S.G. § 4B1.1), the panel decision in that case was vacated by the granting of en banc review, *see* 6 Cir. R. 35(a), and the panel decision remains vacated even though the government has withdrawn its appeal, *see Funk*, 560 F.3d at 619 ("The opinion of the panel, which was vacated pursuant to the court's order of December 18, 2008 granting en banc review, 6 Cir. R. 35(a), remains vacated.").

categorical policy disagreements as 'individualized determinations.'" 129 S. Ct. at 844. Observing that the former outcome contradicted its holding in *Kimbrough*, and that the latter represented "institutionalized subterfuge," the Court concluded that "[n]either is an acceptable sentencing practice." *Id.* This reasoning applies equally to other aspects of the Sentencing Guidelines.

In any event, even if *Kimbrough* and *Spears* could be read more narrowly, the authority of district courts to reject the Guidelines on policy grounds follows inexorably from the Court's holding in *Booker* that the Guidelines are advisory only. As we have recognized, *Booker* and its progeny emphatically "empowered" the district courts to reject the recommendations of the Sentencing Commission. *See Vonner*, 516 F.3d at 392 (observing that "*Booker* empowered district courts, not appellate courts and *not the Sentencing Commission*" (emphasis added)). To construe the district courts' authority more narrowly, as Herrera-Zuniga argues we should, thus would run counter to a fundamental principle underlying the Supreme Court's post-*Booker* sentencing jurisprudence. *See id.* (observing that "the central lesson from [the Court's post-*Booker*] decisions [is] that district courts have considerable discretion in this area and thus deserve the benefit of the doubt when we review their sentences and the reasons given for them."); *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008) ("The Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence.").

We thus see no reason to limit the authority recognized in *Kimbrough* and confirmed in *Spears* to the crack-powder cocaine context. Nor do we stand alone in that regard. In fact, "[a]mong those that have taken a definitive position, our sister circuits appear to be uniformly in accord with this view." *United States v. Lente*, No. 07-2035, 2009 U.S. App. LEXIS 9391, at *46 (10th Cir. April 29, 2009) (Holmes, J., concurring) (citing *United States v. Cavera*, 550 F.3d 180, 196-97 (2d Cir. 2008) (upholding district court's variance based on its finding that the Guidelines failed to take into account "the greater need for deterrence in New York" for firearms offenses because its strict firearms laws had produced a comparatively "more profitable black market in firearms"); *United*

*States v. Tankersley*, 537 F.3d 1100, 1113 (9th Cir. 2008) (applying *Kimbrough* to conclude that the district court's "decision to depart—based on its desire to punish terrorist activities directed at private conduct in a manner similar to how it punished terrorist activities direct [sic] at government conduct—did not render [the defendant's] sentence per se unreasonable"); *United States v. Herrera-Garduno*, 519 F.3d 526, 530 (5th Cir. 2008) (relying on *Kimbrough* to hold the district court's policy disagreement "with how 'drug trafficking offenses' are defined under § 2L1.2" provided a "sufficient reason to impose a non-Guidelines sentence ")); *see also United States v. Boardman*, 528 F.3d 86, 87-88 (1st Cir. 2008) (holding that *Kimbrough* granted district courts "broader freedom" to determine whether prior convictions qualify as predicate "crimes of violence" for purposes of the career offender Guideline).

That district courts *possess* the authority to categorically reject the Guidelines, however, does not necessarily mean that it was proper to *exercise* that authority in this case. Although the Guidelines are advisory, they still provide important guidance for district courts. *See Kimbrough*, 128 S. Ct. at 574 (recognizing that the Sentencing Commission plays a "key role" and "fills an important institutional role"); *Gall*, 128 S. Ct. at 596 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). Consequently, we must scrutinize closely any decision to reject categorically the Sentencing Commission's recommendations. *See Spears*, 129 S. Ct. at 843 (explaining that "an 'inside the heartland' departure (which is necessarily based on a policy disagreement with the Guidelines and necessarily disagrees on a 'categorical basis,') may be entitled to less respect"). Our best guidance in this regard is *Kimbrough*, where the Court found that the district court's rejection of the crack cocaine Guidelines was reasonable "because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role." 128 S. Ct. at 575. In other words, a categorical, policy-based rejection of the Guidelines, even though entitled to "less respect," nevertheless is permissible where the guidelines in question "do not exemplify the Commission's exercise of its characteristic institutional role." *Id.*; *see United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) (finding that the Guidelines' fast-track departure scheme

did not "exemplify the [Sentencing] Commission's exercise of its characteristic institutional role," and thus it "deserve[d] less deference than the sentencing guidelines normally attract").

Although this may not be the only circumstance in which sentencing courts are authorized to reject the Guidelines on policy grounds, it is sufficient to support the district court's decision in this case.  As explained above, the district court rejected the advisory Guidelines range on the grounds that the base offense level prescribed under § 2L1.2(a) was arbitrary and out of balance with Congress' determination of the seriousness of this type of offense.   In other words, before considering any individualized sentencing factors, the court was unpersuaded that the offense level chosen by the Sentencing Commission fulfilled the sentencing goals set forth by Congress in § 3553(a).   Under *Kimbrough* and *Spears*, that is an adequate and appropriate basis for refusing to follow the advisory Guidelines range.

**Failure to Distinguish Between "Departure" and "Variance"**

Second, Herrera-Zuniga asserts that the court committed procedural error by failing to adequately explain its methodology for calculating his sentence.  In particular, he claims that the district court was required to specify whether its decision to impose an above-Guidelines sentence was a "departure" under U.S.S.G. § 4A1.3 or a "variance" based on the court's consideration of the factors enumerated in 18 U.S.C.§ 3553(a).  To the extent that the district court imposed an above-Guidelines sentence based on a departure under § 4A1.3(a), Herrera-Zuniga also challenges the district court's failure to specify a "final offense level."

This Court has recognized the distinction between sentencing departures under U.S.S.G. § 4A1.3 and variances under 18 U.S.C. § 3553(a). *See United States v. Jordan*, 544 F.3d 656, 671 n.12 (6th Cir. 2008) ("A sentence outside the Guidelines based on Chapter 5 of the Guidelines is a 'departure' or 'Guideline departure,' whereas a sentence outside the Guidelines based on the § 3553(a) factors is a 'variance' or 'non-Guideline

departure.'"). Unlike some of our sister circuits,[10] however, we have not required that district courts carefully distinguish between whether the decision to deviate from the advisory Guidelines range is based on a departure or variance. *See id.* (construing the district court's deviation as a variance rather than a departure because it "based its sentence on the § 3553(a) factors," but finding no error in the court's failure to specify the basis for its rejection of the advisory Guidelines range). Although the sentencing court is required to provide an "adequate explanation" of the basis for its decision, the court "may exercise discretion in determining how much of an explanation of the sentence is required because 'the amount of reasoning required varies according to context.'" *United States v. Jeross*, 521 F.3d 562, 582-83 (6th Cir. 2008) (quoting *Liou*, 491 F.3d at 338).

Moreover, because the sentencing court has authority to deviate from the advisory Guidelines range under either § 3553(a) or § 4A1.3, the failure to specify to what extent each factored into the court's determination of an appropriate sentence does not affect our ability to review the reasonableness of the deviation. *See Rita*, 551 U.S. at 356 (requiring only that the sentencing judge "set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority"); *United States v. Kirby*, 418 F.3d 621, 626 (6th Cir. 2005) (requiring only that the district court must "articulate its reasoning in deciding to impose a sentence" in such a manner that is sufficient "to allow for reasonable appellate review"); *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005) (finding no per se error in the district's "fail[ure] to discuss the extent of the departure at all," because "[t]he question before us on appeal is what quality of analysis and explanation, if any, is necessary where the district court exercises its discretion to vary a defendant's sentence from the applicable range provided by the now-advisory Guidelines"); *see also Tankersley*, 537 F.3d at 1114 ("The old departure scheme is relevant today only insofar as factors that might have supported (or not supported) a departure may tend to show that a non-guidelines sentence is (or is not) reasonable.");

---

[10]*See, e.g.*, *United States v. Wise*, 515 F.3d 207, 216 (3d Cir. 2008); *United States v. Solis-Bermudez*, 501 F.3d 882, 884 (8th Cir. 2007).

*United States v. Mohamed*, 459 F.3d 979, 986 (9th Cir. 2006) (concluding that "the scheme of downward and upward 'departures' [was] essentially replaced by the requirement that judges impose a 'reasonable' sentence"). Accordingly, Herrera-Zuniga's first argument is unavailing.

Although more compelling, Herrera-Zuniga's second argument also must fail. In cases such as this, where the district court determines that an upward departure is warranted but the defendant's criminal history score already places him or her in category VI, the Guidelines recommend that the court "should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case." U.S.S.G. § 4A1.3(a)(4)(B). Over the years, this Court has considered various methods adopted by district courts in applying this provision. For instance, in *United States v. Carr*, 5 F.3d 986 (6th Cir. 1993), we held that § 4A1.3 requires a district court to consider each successive sentencing range that would result from an incremental increase of the offense level, concluding that the district court was precluded from increasing the defendant's offense level unless the court "demonstrate[s] why it found the sentence imposed by each intervening level to be too lenient." *Id.* at 994 (citing *United States v. Lassiter*, 929 F.2d 267, 270 (6th Cir. 1991)). In *United States v. Gray*, 16 F.3d 681 (6th Cir. 1994), we read § 4A1.3 to preclude a district court from "creat[ing] a hypothetical criminal history category greater than VI." *Id.* at 683.

Following *Booker*, however, our decisions have made abundantly clear that a rigid understanding of the methodology recommended under the Guidelines "is not binding on the district court, and should not be substituted for the district court's judgment." *United States v. Griffin*, 530 F.3d 433, 441 (6th Cir. 2008) (citing *United States v. Brown*, 371 F.3d 854, 860 (6th Cir. 2004)). In fact, even before *Booker*, we had rejected such a mechanical application of § 4A1.3, concluding that sentencing judges were not required "to explain formalistically, gridblock by gridblock, why each intervening range is inappropriate." *Thomas*, 24 F.3d at 835 ("Such a rigid, formalistic and essentially meaningless exercise to determine a sentence is not required by the

guidelines, nor is it necessary to the fair and impartial administration of criminal justice."). As we explained in *United States v. Brown*, 371 F.3d 854 (6th Cir. 2004), although an "expedient" formula may be useful "as a reference point," "the use of such a construct . . . cannot replace the exercise of the court's independent judgment." *Id.* at 860. Thus, regardless of the method employed, "the whole point of the exercise is to 'find[] a guideline range appropriate to the case.'" *Id.* (internal citation omitted) (quoting *Thomas*, 24 F.3d at 835). Simply put, this Court has rejected "a mechanistic approach to departures." *Thomas*, 24 F.3d at 833. The logic underlying our decisions in *Thomas* and *Brown* is clear: because the Sentencing Guidelines are advisory only, the particular methodology set forth in § 4A1.3 cannot be binding.

Given this rejection of a formulaic approach to departures, we cannot say that it always is *per se* procedurally unreasonable for a district court to fail to specify whether its deviation was based on a departure or variance, or to specify an adjusted offense level.[11] The only statutory requirement is that the district court impose a sentence that accords with, but is "not greater than necessary" to achieve, the settings goals identified by Congress. 18 U.S.C. § 3553(a). Regardless of the method employed, "at the end of the day the court must decide, in light of all the facts and circumstances of the particular case before it, whether the range in question is appropriate to the case." *Brown*, 371 F.3d at 860 (internal quotations marks omitted). Generally speaking, this requires that the sentencing judge consider "the seriousness of the defendant's past criminal conduct, the likeliness of recidivism, prior similar adult conduct not resulting in criminal convictions, previous lenient sentences for offenses, whether the sentence will have a deterrence on future criminal conduct, the necessity of isolating the defendant from the community and the length of time necessary to achieve rehabilitation, if rehabilitation is possible." *Thomas*, 24 F.3d at 833 (citing *United States v. Joan*, 883 F.2d 491, 496 (6th Cir. 1989)).

---

[11]In certain circumstances, the failure to explain the basis for a deviation or an adjusted sentencing range might create confusion that itself rises to the level of sentencing error. *See, e.g.*, *United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009).

Although the district court is required to properly calculate the Guidelines range, that is only a "starting point and initial benchmark" of the sentencing analysis. *Gall*, 128 S. Ct. at 596.  There is no requirement that, after concluding that a departure is warranted, the court must specify a new, adjusted sentencing range.  And because we apply a presumption of reasonableness only to sentences falling within the initial sentencing range recommended under the Guidelines, *see Smith*, 474 F.3d at 892, there also would be no intrinsic need to specify an adjusted sentencing range to aid our appellate review.

In this case, the record reflects that the district court properly calculated the initial Guidelines range and thoroughly considered the relevant § 4A1.3 *and* § 3553(a) factors, finding that Herrera-Zuniga's criminal history category underrepresented his criminal history and that he was likely to commit other crimes.  The district court did not commit procedural error by failing to explain whether its deviation was based on a departure or variance.  Nor did it err by failing to specify a final, adjusted sentencing range.

**Herrera-Zuniga's Criminal History**

Finally, Herrera-Zuniga argues that the district court improperly concluded that his criminal history score did not adequately reflect the full significance of his prior criminal conduct. Although acknowledging that it is within the prerogative of the sentencing judge to deviate from the advisory Guidelines range where the defendant's criminal history category does not adequately represent and account for the defendant's past criminal conduct, U.S.S.G. § 4A1.3; *see also Griffin*, 530 F.3d at 441; *Smith*, 474 F.3d at 891, Herrera-Zuniga argues that such a finding is not supported in this case.  We disagree.

Because defense counsel failed to raise this issue below and failed to object on this ground after sentencing, we review this issue for plain error.  *Vonner*, 516 F.3d at 386.  To demonstrate plain error, Herrera-Zuniga must show "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'"  *Id.* (quoting

*United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)).  We will find such error "only in exceptional circumstances," and only "where the error is so plain that the trial judge . . . [was] derelict in countenancing it."  *Gardiner*, 463 F.3d at 459.

Applying that standard here, we find no reversible error.  As an initial matter, although a finding that a defendant's past criminal conduct is "extensive and egregious" is *sufficient* to warrant an upward departure, *Smith*, 474 F.3d at 891, nothing in our case law suggests that such a finding is *necessary* for a court to depart upwards.  On the contrary, because the Guidelines are advisory only, the limitations set forth in § 4A1.3 do not delineate the outer bounds of the sentencing court's authority to impose a sentence above the recommended sentencing range, nor is a sentencing court required to limit its consideration to factors relevant to § 4A1.3.  Whereas § 4A1.3(a)(1) permits an upward departure only where the defendant's criminal history category "substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," the court's authority under § 3553(a) more broadly permits consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed . . . to protect the public from further crimes of the defendant."  A district court always can impose an above-Guidelines sentence so long as it is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

Thus, even if we were to accept Herrera-Zuniga's argument that his criminal history score adequately accounted for the seriousness of his past criminal conduct, that would not have precluded the district court from imposing an above-Guidelines sentence in this case.  *See United States v. Tate*, 516 F.3d 459, 468 (6th Cir. 2008) (affirming upward departure under § 4A1.3 where sentencing judge based its departure on "a wide range of considerations," some of which were not directly related to defendant's criminal history).  The only requirement is that the court determine, "in light of all the facts and circumstances of the particular case before it, whether the range in question is appropriate to the case."  *Brown*, 371 F.3d at 860 (internal quotations marks omitted).

In any event, after reviewing the record and giving due deference to the sentencing judge's determinations, we are satisfied that the district court's conclusion that a harsher sentence was warranted on this basis was not plain error. In explaining its reasons for imposing a harsher sentence, the district court made clear that it was troubled by Herrera-Zuniga's "egregious" criminal record, which it reasonably concluded evidenced a high likelihood of recidivism. The court also noted that the PSIR detailed several incidents of prior criminal conduct that did not result in a conviction, or otherwise were not included in the PSIR's criminal history calculation. *See* PSIR ¶¶ 26, 39, 40. In addition to the *number* of prior convictions, the court also expressed concern regarding the *nature* of those offenses, reasoning that Herrera-Zuniga's repeated decision to drive while intoxicated posed a more significant danger to the public than was reflected in his criminal history score. *See* ROA vol. 2 at 14. Because these findings are adequately supported in the record, the court's conclusion that Herrera-Zuniga's criminal history score did not fully capture the seriousness of his past criminal conduct was not unreasonable, and certainly not plain error. *See United States v. Matheny*, 450 F.3d 633, 640 (6th Cir. 2006).

Again though, even if the court's departure cannot be sustained under § 4A1.3, the seriousness of Herrera-Zuniga's criminal history was not the only consideration on which the district court relied in imposing a harsher sentence. The district court also noted several § 3553(a) factors that warranted imposing a harsher sentence. For instance, in discussing the nature and circumstances of Herrera-Zuniga's present offense, the court expressed particular concern that Herrera-Zuniga had illegally reentered the United States only a few months after being deported for the third time. The court concluded that this demonstrated Herrera-Zuniga's utter lack of respect for the law. Under our controlling authority, such considerations provide a reasonable basis for imposing a harsher sentence. *See Thomas*, 24 F.3d at 833 ("Both the criminal history score and the high likelihood of recidivism are valid, legal reasons for an upward departure from the guidelines and satisfy the first prong of our test."); *see also Solis-Bermudez*, 501 F.3d at 887 (finding that a defendant's "history of deportation and

illegal reentry, together with his serious criminal record, justified the district court's upward variance").

## V.

In addition to his procedural challenges, Herrera-Zuniga also argues that the length of his sentence is substantively unreasonable because it is "greater than necessary" to accomplish the sentencing goals identified by Congress in 18 U.S.C. § 3553(a).

Although a sentence that falls within the Guidelines range warrants a presumption of reasonableness in this circuit, there is no presumption against a sentence that falls outside of this range. *See Smith*, 474 F.3d at 892. Rather, "[t]his court has applied a form of proportionality review to sentences outside the Guidelines range, so that 'the greater the variance from the range, the more compelling the justification for variance must be.'" *Tate*, 516 F.3d at 470 (quoting *Smith*, 474 F.3d at 892). Nevertheless, "while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *Gall*, 128 S. Ct. at 591.

Applying that standard, and in light of our upward departure case law, we are satisfied that the sentence imposed by the district court, although certainly harsh, is not "unreasonable." *See Griffin*, 530 F.3d at 440-41; *Tate*, 516 F.3d at 468-70; *Brown*, 371 F.3d at 859-60; *Smith*, 47 F.3d at 892; *Thomas*, 24 F.3d at 833-35. Regardless of whether we would have imposed the same sentence, we must afford due deference to the district court's decision to determine the appropriate length of the defendant's sentence, so long as it is justified in light of the relevant § 3553(a) factors. *See Kimbrough*, 128 S. Ct. at 576 ("Giving due respect to the District Court's reasoned appraisal, a reviewing court could not rationally conclude that the 4.5-year sentence reduction Kimbrough received qualified as an abuse of discretion."); *Vonner*, 516 F.3d at 392 ("Our affirmance in today's case respects the central lesson from these decisions—that district courts have considerable discretion in this area and thus deserve the benefit of the doubt when we

review their sentences and the reasons given for them."). As our discussion of the factual record makes clear, a host of factors support the sentencing judge's conclusion that a particularly harsh sentence was warranted in this case, including Herrera-Zuniga's significant criminal history, his repeated recidivism, the seriousness of his offenses, the nature and circumstances of his latest offense, his repeated failure to complete substance abuse programs, and the need to protect the public from his inability to refrain from driving while intoxicated.

## VI.

Although we have resolved all of the issues raised by the parties, we feel the need to discuss one additional issue. As explained in detail above, the Assistant Federal Public Defender assigned to Herrera-Zuniga's case chose to submit to the court a letter written to Herrera-Zuniga in lieu of a "likely useless" discussion of the § 3553(a) factors. At a minimum, that strategy was highly questionable. Not only was the tone of the letter highly unprofessional, but many of the statements made therein cast Herrera-Zuniga's conduct in a particularly unfavorable light, seemingly supporting the court's inclination to depart upward. We thus are concerned that defense counsel's chosen "strategy" constitutes professional malfeasance and, potentially, constitutionally ineffective assistance of counsel.

As a "general rule," we do not consider on direct appeal whether defense counsel's performance constituted constitutionally ineffective assistance, primarily because "there has not been an opportunity to develop and include in the record evidence bearing on the merits" of that issue. *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). We have recognized an exception to that rule, however, where "the record is adequate to assess" the issue. *Id.*

In this case, the record is clear that Stroba failed to raise any § 3553(a) factors in response to the court's Notice of Intent to Upward Depart, despite the fact that the PSIR identified several potentially relevant considerations, including Herrera-Zuniga's decision to return to the United States to support his sick daughter. According to Stroba, he chose not to engage in a "likely useless review of the 18 U.S.C. § 3553(a) factors"

because "[t]here is not one thing about [Herrera-Zuniga's] situation that lends itself to a positive thought." ROA vol. 1 at 16, 19. Such statements raise serious concerns that Stroba failed to fulfill his duty to advocate on his client's behalf. *See Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974) (noting that defense counsel "must conscientiously protect his client's interest" by asserting "all apparently substantial defenses available to the defendant . . . in a proper and timely manner").

Moreover, Stroba's letter actually went beyond that and expounded on and emphasized the seriousness of his client's misdeeds. In fact, the sentencing memorandum and the letter Stroba attached to it read more like a prosecutor's argument in favor of a harsher sentence. For instance, Stroba's letter belittles Herrera-Zuniga as being "at the bottom of society's hierarchy," and exclaims that it is "only a matter of time" before Herrrera-Zuniga "kill[s], maim[s], or injure[s] some innocent driver or passenger in another vehicle or a bystander." ROA vol. 1 at 20. From the record before us, we do not understand how a federal public defender could in good faith make such statements to the sentencing court about his client.

At oral argument before this Court, Stroba suggested that he submitted this letter to the court in an effort to convince the court that his client understood the seriousness of his offenses, thus hopefully dissuading the court from imposing an overly harsh sentence. Perhaps that explanation would be more plausible had Stroba made at least one statement to that effect before the district court. The sentencing memorandum and the transcript from the sentencing hearing, however, are entirely bereft of any comments suggesting that Herrera-Zuniga appreciates the seriousness of his offenses or that he was repentant in any way. It seems much more likely that Stroba simply washed his hands of the matter and abdicated his responsibility to advocate on behalf of his client: "I am truly at a loss to figure out how to explain to Chief Judge Bell that somehow or in some manner, he should not treat you most severely. . . . I am sorry to be so blunt, but I have to honest with you, your case has left me without an expressible empathy. For this I am sorry because it leaves me almost unable to advocate on your behalf." ROA vol. 1 at 20.

In light of such statements, we are concerned that Stroba may have rendered constitutionally ineffective assistance. *See Strickland v. Washington*, 466 U.S. 668, 685 (1984) (holding that the Sixth Amendment right to counsel entitles an accused "to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair"). In fact, because Stroba's letter essentially argued *against* his client's interests, Stroba's conduct may have been "so likely to prejudice the accused" that any ineffective assistance concerns should be evaluated under *United States v. Cronic*, 466 U.S. 648 (1984). *See Wright v. Van Patten*, 552 U.S. ___, 128 S. Ct. 743, 746 n.1 (2008) (per curiam) (recognizing that *Cronic*'s presumption of prejudice applies "when 'there [is] a breakdown in the adversarial process,' such that 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing'" (quoting *Cronic*, 466 U.S. at 662, 659)).

Nevertheless, given that further evidence may be relevant to evaluating the validity of Stroba's explanation, we decline to resolve this issue at this stage.[12] However, we order that Stroba provide a translated copy of this opinion to his client so that Herrera-Zuniga can evaluate his options for seeking habeas relief on this basis.

## CONCLUSION

For the foregoing reasons, we hereby **AFFIRM** the sentence imposed by the district court.

---

[12]Moreover, given the contents of the letter, it seems highly unlikely that Herrera-Zuniga gave his consent to its disclosure to the court. Consequently, disclosing the letter may have violated Rules 1.4(a) and 1.6(a) of the American Bar Association's Model Rules of Professional Conduct. That issue also deserves further evidentiary inquiry.